IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| YELINA GYAMFI | : | |
| | : | |
| v. | : | Civil Action No. DKC 20-1952 |
| | : | |
| FOULGER-PRATT CONTRACTING, LLC, *et al.* | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment action is a motion for partial summary judgment filed by Foulger-Pratt Contracting, LLC ("Foulger-Pratt") and Jose Ramirez ("JR") (collectively "Defendants"). (ECF No. 11). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, Defendants' motion for partial summary judgment will be granted.

**I.   Background**[1]

On April 8, 2019, Ms. Yelina Gyamfi ("Plaintiff") began working for Foulger-Pratt as a project coordinator. In this role, she was responsible for providing administrative support to a project team at the Eckington Park construction site in northwest Washington D.C.  Ms. Gyamfi reported directly to Matthew McNiesh,

---

[1] Unless otherwise noted, the following facts are undisputed and construed in the light most favorable to Plaintiff.

the Project Manager.[2]  Around the same time that Ms. Gyamfi was hired, Foulger-Pratt also hired JR as project superintendent.  Ms. Gyamfi and JR worked together on the project team along with approximately three other employees.  Plaintiff was the only female on the project team.

Shortly into Ms. Gyamfi's tenure at Foulger-Pratt, she began having performance issues related to attendance and arriving on-time.  In around June or July of 2019, Mr. McNiesh raised these performance issues during a conversation with Ms. Gyamfi.  Mr. McNiesh then raised Plaintiff's attendance issues again during her July 2019 performance review.  On August 5, 2019, Mr. McNiesh had another conversation with Ms. Gyamfi about clocking in and out every day, keeping a consistent schedule, providing advanced notice if she had to call out, and wearing proper workplace safety attire.  This discussion was documented in a follow-up email that Mr. McNiesh sent to Plaintiff that day.  (ECF No. 11-2, at 80). Despite multiple conversations, Ms. Gyamfi's performance issues continued.  On September 17, 2019, Mr. McNiesh instructed Plaintiff not to place any purchase orders without prior approval.  In October 2019, Plaintiff received another reprimand for chronic lateness.  On December 10, 2019, she was reprimanded for being

---

[2] Although Mr. McNiesh was Plaintiff's direct supervisor, she was hired by Mr. McNiesh's bosses, Brad Stevens and Brett Harton, while Mr. McNiesh was away on vacation.

late and making careless mistakes in emails to clients. On January 6, 2020, Mr. McNiesh held a meeting with Plaintiff to discuss the importance of completing safety documentation in accordance with established procedures to avoid receiving violations from the Occupational Safety and Health Administration. On January 7, 2020, Mr. McNiesh met with Plaintiff yet again and reiterated the need to obtain approval before placing purchase orders as she had repeatedly ordered unnecessary or overly expensive supplies.

On January 13, 2020, Mr. McNiesh convened a meeting with Plaintiff to discuss all of her ongoing performance issues. During the meeting, he emphasized that Ms. Gyamfi continued to arrive late and had not clocked in by her scheduled 8:30 am start time since October 2019. He added that her absences were disruptive to the project and that her careless mistakes in emails created more work for the team. He also noted her failure to follow safety documentation procedures and to obtain approval before making purchases despite previous warnings.

JR was also present at the meeting to discuss specific performance issues that he had observed. JR explained that he noticed the safety documentation procedures were not being followed and had asked one of his direct reports, Miguel Antonio, to call a meeting with Ms. Gyamfi to go over the proper procedures. JR stated that Ms. Gyamfi arrived three hours late to that meeting

3

and then acted rudely towards Mr. Antonio during the meeting. Plaintiff was informed that her role required supporting all team members and communicating with them in a professional manner. At the conclusion of the meeting, Ms. Gyamfi received a written warning detailing all of the performance issues discussed and stating that "failure to adhere to the above infractions and meet expectations will result in further disciplinary action up to and including termination." (ECF No. 11-2, at 81). The written warning was signed by Ms. Gyamfi and Mr. McNiesh.[3] Ms. Gyamfi was further instructed to send Mr. McNiesh a "corrective action plan" detailing how she would improve her performance moving forward. Later that day, Ms. Gyamfi emailed Mr. McNiesh a list of bullet points stating that she would be on time more consistently, make babysitting arrangements when necessary to avoid calling out, not show aggression towards others, proofread all emails, and follow the safety documentation procedures.

The following morning, however, on January 14, 2020, Plaintiff contacted Mr. McNiesh to call out of work for that day and the following day. Mr. McNiesh states that this is the moment he decided to terminate Plaintiff and contacted Foulger Pratt's

---

[3] Plaintiff states that JR also signed off on the written warning at the end of the meeting. This assertion is directly contradicted by the copy of the written warning in the record which shows only Plaintiff's signature on the "employee" line and Mr. McNiesh's signature on the "supervisor" line. (ECF No. 11-3, at 12).

4

Head of Human Resources, Andrea Hewitt, to begin the formal termination process. (ECF No. 11-2, at 7-8) ("I, basically, you know, determined that it was -- the plan of action should be to terminate her . . . [b]ecause she didn't provide an adequate plan and she proceeded to call [out of work] again the next day."). After calling out, Plaintiff then emailed Serina Lacey, an employee in Foulger-Pratt's human resources department, asking for a meeting to discuss concerns "with [her] position and the company." (ECF No. 14-2, at 82).

    Ms. Lacey responded the next day, on January 15, 2020, and directed Plaintiff to contact Ms. Hewitt with her concerns. A short time later, Plaintiff called Ms. Hewitt and reported that JR had sexually harassed her on four occasions between August and November 2019. First, Plaintiff stated that JR groped her buttocks in a trailer at the construction site in August 2019. Specifically, Plaintiff stated that JR called her into his office inside a trailer, scraped dirt off of her "butt," and then said, "I didn't want to do it outside or I didn't want to like embarrass you[.]". (ECF No. 14-2, at 57). Plaintiff stated that she quickly left the trailer after the interaction. Second, Plaintiff stated that between August and September 2019, JR repeatedly made negative comments about her weight in the presence of other co-workers. Third, Plaintiff stated that JR sexually assaulted her in his car after driving her home from a work sponsored bowling event in

October 2019.  Specifically, Plaintiff states that when the car approached her home, JR locked his car doors, grabbed her breast, forcibly placed her hand on his crotch, and demanded oral sex.  After Plaintiff refused and threatened to tell Mr. McNiesh, JR unlocked his car doors and Plaintiff left.  Plaintiff recounted that the following day at work JR apologized and asked her not to repeat the incident to anyone or it would ruin both of their careers.  Finally, Plaintiff stated that on two occasions in November 2019, JR attempted to put a dollar bill down her shirt in front of other co-workers.  Prior to reporting the misconduct to Ms. Hewitt, Plaintiff had not told anyone at Folger-Pratt about these incidents.

Ms. Hewitt launched an investigation into Plaintiff's complaint that same day.  She called each member of the project team individually and, without revealing that a complaint had been made, asked each person if they had ever observed any inappropriate conduct between members of the project team.  Ms. Hewitt documented each team members' response.  (ECF No. 11-5, at 7-22).  None of the team members reported any inappropriate conduct towards Ms. Gyamfi.  To the contrary, one team member stated that it was Ms. Gyamfi who had acted "rudely" and "disrespectful[ly]" towards another team member named Anthony.  (ECF No. 11-5, at 8).  Anthony also told Ms. Hewitt during his interview that Ms. Gyamfi was rude to him and that he did not feel comfortable interacting with her

6

without another person present.  (ECF No. 11-5, at 14-22).  Based on the interviews, Ms. Hewitt determined that there was no evidence to support Ms. Gyamfi's allegations.

On January 16, 2020, Plaintiff returned to the project site after two days absence and was given a formal termination letter. The letter, effective January 16, 2020, was signed by Mr. McNiesh's supervisors, Brad Stevens and Brett Harton.

On June 30, 2020, Plaintiff filed a four-count complaint alleging hostile work environment and retaliation in violation of Title VII against Foulger-Pratt (Counts I and II) and assault and battery against JR (Counts III and IV).  (ECF No. 1).  Defendants filed a motion for summary judgment on Counts I and II on January 12, 2021.  (ECF No. 11).  Plaintiff responded in opposition on February 2, 2021, (ECF No. 14), and Defendants replied on February 16, 2021.  (ECF No. 15).  Plaintiff supplemented her response that same day.  (ECF No. 16).

**II.  Standard of Review**

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing

7

law." *Liberty Lobby*, 477 U.S. at 248.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.,* at 249.  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Chung Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014). Hearsay statements or conclusory statements with

8

no evidentiary basis cannot support or defeat a motion for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 967 (4th Cir. 1995).

**III. Analysis**

Defendants move for summary judgment only as to Plaintiff's Title VII claims in Counts I and II.  Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1).

    **A.**   **Title VII Hostile Work Environment**

Plaintiff alleges in Count I that she was subjected to a hostile work environment based on her gender.  To establish a hostile work environment claim based on gender, Plaintiff must show that:  (1) the harassment was unwelcome; (2) the harassment was based on her gender; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.  *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir. 2001).

An employer's liability for harassment under Title VII may depend on the status of the harasser:  if the harassing employee

is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is the victim's "supervisor," however, different rules apply. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 809 (1998). *Vance v. Ball State University*, 570 U.S. 421 (2013) clarified that under Title VII a "supervisor" is a person "empowered by the employer to take tangible employment actions against the victim." *Id*. at 424. Specifically, the individual must possess the power to hire, fire, demote, promote, transfer, or discipline the plaintiff. *Id*. at 425. By contrast, "those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree" are not supervisors. *Id*. The first two elements—that the conduct at issue was unwelcome and based on sex—are not in dispute here. The court also agrees that the conduct alleged, including the physical groping of Plaintiff's body, was sufficiently severe to constitute a hostile work environment. *See Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 414 (D.Md. 2015) ("Indeed, 'inappropriate physical touching is certainly a strong indicator of a hostile work environment[.]'") (citing *Langley v. Dolgencorp, LLC*, 972 F.Supp.2d 804, 812 (D.S.C.2013)). Thus,

10

Plaintiff's claim turns on whether there is a basis for imputing liability to Foulger-Pratt, which turns on whether JR was Plaintiff's supervisor. The parties disagree whether the conduct was sufficiently severe to create a hostile environment, and whether JR was Plaintiff's supervisor or co-worker.

To support her argument that JR was her supervisor, Plaintiff argues that JR: (1) was present at the January 13th meeting; (2) helped draft the written warning given during that meeting; (3) signed the written warning; and (4) supervised other employees on the jobsite. None of these arguments are sufficient for finding that JR was Plaintiff's supervisor as that term is defined under Title VII. To begin, Plaintiff and Mr. McNiesh both unequivocally testified that he, not JR, had been her supervisor since her initial hiring. Plaintiff places much weight on JR's presence at the January 13th meeting in arguing that JR was her supervisor. Mr. McNiesh, however, testified that he alone wrote her written employee warning. (ECF No. 15-1, at 6). Moreover, Plaintiff admits that Mr. McNiesh led the meeting and did the majority of the talking. Plaintiff also offers no proof to support her assertion that JR signed the written warning. To the contrary, the record evidence shows that JR did not sign the document–only Mr. McNiesh and Plaintiff did. (ECF No. 11-2, at 81). Finally, while Plaintiff asserts that JR supervised *other employees*, this is insufficient – JR must have been *Plaintiff's* supervisor to

11

impute liability to Foulger-Pratt. Thus, JR was not Plaintiff's supervisor for purposes of Title VII.

Having concluded that JR was Plaintiff's coworker rather than supervisor, the court must next determine whether liability for the harassing conduct can be imputed to Foulger-Pratt because it was negligent in controlling Plaintiff's work conditions. It was not. In instances where the harasser is a coworker rather than a supervisor, then the employer may be held liable only if the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008)). An employer's negligence may be established where the plaintiff proves that the employer failed to provide reasonable procedures for victims of harassment to report complaints. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011). An employer's written anti-harassment policy "provides 'compelling proof' that the company exercised reasonable care in preventing and correcting harassment," unless the policy was "adopted or administered in bad faith or . . . it was otherwise defective or dysfunctional." *Id.* (quoting *Barrett v. Applied Radiant Energy*, 240 F.3d 262, 266 (4th Cir. 2001)); *cf. Davis v. City of Charlottesville Sch. Bd.*, 498 Fed.Appx. 231, 2012 WL 5953404, at *1 (4th Cir. 2012) (finding complaint adequately stated a claim for negligence when plaintiff

"alleged that she immediately reported her first incident of harassment to a supervisor and that the harassment occurred again after she brought it to the attention of her employer").

Here, Plaintiff does not allege that she was ever subjected to harassment again after making her complaint, nor could she plausibly allege this because she was terminated immediately upon returning to work, leaving no time for subsequent harassment to occur. Even if she had, Foulger-Pratt demonstrated that it had a written anti-harassment policy which was provided to Plaintiff, (ECF No. 11-2, at 3-4), and the fact that Plaintiff was able to report her complaint to Ms. Hewitt shows that Foulger-Pratt provided a reasonable procedure for reporting complaints. Plaintiff's argument that the investigation was conducted in bad faith simply because it lasted only one day is unavailing because there were only a handful of team members to interview in order to follow up on Plaintiff's allegations. Accordingly, Plaintiff cannot show that Foulger-Pratt was negligent or failed to take effective action to stop the harassment and there is no basis for imputing liability to Foulger-Pratt. Accordingly, Foulger-Pratt is entitled to summary judgment on Plaintiff's Count I.

    **B.    Title VII Retaliation**

In Count II, Plaintiff alleges that Foulger-Pratt retaliated against her in violation of Title VII by terminating her employment on January 16, 2020 for reporting sexual harassment on January 15,

13

2020. To survive summary judgment on this claim, Plaintiff must produce either direct evidence of retaliation or make use of the test outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Because she does not possess direct evidence, Plaintiff must employ the *McDonnell Douglas* approach. *Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). Under this approach, Plaintiff would need to demonstrate three elements:  (1) she engaged in protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Davis v. Dimensions Health Corp.,* 639 F.Supp.2d 610, 616 (D.Md. 2009); *accord Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007). Once the plaintiff establishes a *prima facie* case of retaliation, the employer must offer a non-retaliatory explanation for the adverse action. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). If the employer offers a non-retaliatory reason, the plaintiff must establish that the employer's explanation is a pretext for retaliation. *See id.*

It is undisputed that Plaintiff engaged in protected activity when she complained of sexual harassment to Ms. Hewitt on January 15, 2020. Likewise, it is also undisputed that Plaintiff suffered an adverse action when she was terminated from her position. The key inquiry, then, is whether Plaintiff has

14

established that a causal connection exists between these two events.

Plaintiff contends that the timing of her termination-the day after her complaint-shows causation. The flaw in Plaintiff's argument is that, despite her assertions to the contrary, Ms. Hewitt was not the decision-maker. Mr. McNiesh was the decision-maker, and he was unaware of her complaint. Ms. Hewitt simply rubber-stamped the decision to terminate Plaintiff made by Mr. McNiesh. This type of formal approval by an HR employee occurs in nearly all decisions to terminate. Plaintiff contends that even if Mr. McNiesh was the decisionmaker, he also had knowledge of her protected activity because Ms. Hewitt interviewed him as part of her investigation on January 15th. This argument fails because Ms. Hewitt asked only if he was aware of any inappropriate behavior between *any* members of the project team. Indeed, the form completed by Ms. Hewitt following her interview of Mr. McNiesh shows that he was asked generally about misconduct not specifically informed of it. Ms. Hewitt did not reveal to anyone that Plaintiff had complained of misconduct by JR. Furthermore, Mr. McNiesh testified that he made the decision to terminate Plaintiff the day prior to her complaint, on January 14th, when she called out of work hours after a meeting in which she was written up for repeated absences. Plaintiff lacks even a scintilla of evidence to support that Mr. McNiesh was aware of her protected activity at the time

15

he decided to terminate her.  Because Plaintiff cannot demonstrate a causal link between her complaint and her termination, she has failed to make out a *prima facie* case of retaliation.  Accordingly, Foulger-Pratt is entitled to summary judgment on Count II.[4]

**IV. Conclusion**

For the foregoing reasons, the motion for partial summary judgment filed by Defendants will be granted.  Summary judgment will be entered in favor of Foulger-Pratt on Counts I and II.  Federal subject matter jurisdiction over this action was based on the Title VII claims in Counts I and II.  Although not entirely clear, it is possible that supplemental jurisdiction may be exercised over the state law claims in Counts III and IV.  When, however, only the federal claims are dismissed, a court has discretion to dismiss the supplemental claims without prejudice.  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  The parties will be ordered to show cause within 14 days why this court should retain supplemental jurisdiction over Plaintiff's remaining

---

[4] Even if Plaintiff had succeeded in making a *prima facie* case, she still could not overcome Defendants' motion for summary judgment because Foulger-Pratt has demonstrated a legitimate business reason for terminating Plaintiff and Plaintiff has not produced evidence sufficient to conclude that Foulger-Pratt's proffered reason was false, or that discrimination was the real reason. Plaintiff has offered no evidence beyond her own speculation to support that her termination was prompted by her complaint rather than her history of performance issues.

state law claims for assault and battery against JR. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge